UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>ELLERY CHACKSFIELD,<br><br>　　　　　Defendant. | Case No.: 11cv2871-AJB (NLS)<br><br>ORDER:<br><br>(1) DENYING PLAINTIFF ALLSTATE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT, (Doc. No. 14); AND<br><br>(2) GRANTING DEFENDANT ELLERY CHACKSFIELD'S MOTION FOR SUMMARY JUDGMENT, (Doc. No. 17). |

  Plaintiff Allstate Insurance Company ("Plaintiff") brings this diversity action against Defendant Ellery Chacksfield ("Defendant"), seeking declaratory relief under 28 U.S.C. § 2201. (Doc. No. 1.) Plaintiff filed a motion for summary judgment on January 4, 2013, (Doc. No. 14), and Defendant filed a cross-motion for summary judgment on January 7, 2013, (Doc. No. 17). Both motions were fully briefed and are currently before the Court. Pursuant to Civil Local Rule 7.1.d.1, the Court found both motions suitable for determination on the papers and without oral argument. Accordingly, the motion hearing set for March 21, 2013 was vacated. After a thorough review of the papers, supporting documentation, and applicable law, the Court DENIES Plaintiff's motion for summary judgment, (Doc. No. 14), and GRANTS Defendant's cross-motion for summary judgment, (Doc. No. 17). The Clerk of the Court is instructed to enter judgment and close the case.

# BACKGROUND

This is a dispute over insurance coverage, whereby the parties disagree over whether Robert Hammers ("Robert") was a resident of Gordon Hammers' ("Gordon") household, and thereby covered under Gordon's Personal Umbrella Insurance Policy ("PUP").[1]  Because none of the material facts at issue in the case are in dispute, the Court sets forth: (1) the living arrangements between Robert and Gordon; (2) the automobile accident and the underlying judgment in San Diego Superior Court between Robert's estate and Defendant; and (3) the terms of the PUP.[2]

## I.   Living Arrangements By and Between Robert and Gordon

Gordon owns an eleven-acre property in rural San Diego County (the "Property").[3] The Property is home to three residences: (1) Gordon's 2,500 square-foot main residence located at 860 Harris Ranch Road; (2) Timothy (Gordon's son) and his wife's 1,200 square-foot smaller residence located at 862 Harris Ranch Road; and (3) Gordon's 22-foot travel trailer Robert was allowed to live in.  (Doc. No. 14, Vida Decl., Ex. A, Gordon Depo. at 30:4-31:23, 54:2-55:23, 62:13-15; Doc. No. 17, O'Nell Decl., Ex. C, Gordon Depo. at 62:11-14.)  The travel trailer was located less than 100 yards from the main

---

[1] To avoid confusion the Court refers to the Robert Hammers and Gordon Hammers by their first names.

[2] Defendant asserts there is a genuine dispute of material fact regarding Gordon's attempted transfer of ownership of Gordon's vehicle to Robert.  Specifically, Defendant argues Gordon's failure to remove the vehicle from his automobile insurance policy creates an inference that Gordon never actually believed the transfer occurred before the accident.  (Doc. No. 19 at 6-7.)  The Court is not inclined to agree.  The fact that Gordon never removed the vehicle from coverage under his automobile insurance policy is not in dispute.  Rather, the parties only dispute the inference drawn from this undisputed fact.  Thus, because a parties' subjective intent cannot be used to create a genuine dispute of material fact, the Court finds all material facts at issue in the case are undisputed.  *See Ca. Traditions, Inc. v. Claremont*, 197 Cal. App. 4th 410, 421 (Cal. Ct. App. 2011).

[3] Gordon purchased the Property in or around 1973.  (Doc. No. 14, Vida Decl., Ex. A, Gordon Depo. at 29-30; Doc. No. 17, O'Nell Decl., Ex. C, Gordon Depo. at 29:4-30:21.)  The Property was subsequently transferred to a family trust in the mid 1990s.  (*Id*.)  In 2001, the "Bell" fire burned down the Property's original manufactured home,  (Doc. No. 17, O'Nell Decl., Ex. C., Gordon Depo. at 31:10-15), causing Gordon and his son Timothy to build replacement manufactured homes in 2002 and 2003.  (*Id.* at 55:21-56:14.)

residence and 200 to 300 yards from the smaller residence. (Doc. No. 17, O'Nell Decl. at 28:8-15, 62:11-15; Doc. No. 14, Vida Decl. at 62:11-14.) The entire Property is surrounded by a five-foot-high barbed wire fence, which acts as a boundary to keep animals from passing over the land. (Doc. No. 17, O'Nell Decl. at 83:15-84:5; Doc. No. 14, Vida Decl. at 83:15-84:5.)

## II. The Accident and the Underlying State Court Action

On December 30, 2008, Robert was involved in a broadside collision with a motorcycle driven by Defendant Chacksfield (the "Accident"). (Doc. No. 1 ¶ 6; Doc. No. 14, Rivera Decl. ¶ 3.) At the time of the Accident, Robert was driving a 1989 Ford Crown Victoria (the "Vehicle"), which was owned by Gordon, and insured by an automobile insurance policy issued to Gordon by Plaintiff (the "Automobile Policy"). (*Id*.) As a result of the Accident, Defendant sustained personal injuries and property damage to his motorcycle. (Doc. No. 14, Rivera Decl. ¶ 8.) Prior to the Accident, Gordon completed a release of liability for the Vehicle with the Department of Motor Vehicles, and told Robert to transfer the registration for the Vehicle into Robert's name. (Doc. No. 14, Vida Decl., Ex. A, Gordon Depo. at 48:1-9.) Robert never completed the transfer, which Gordon was unaware of, and at the time of the Accident, the Vehicle was still registered to Robert. (*Id*.) On January 7, 2010, Robert passed away from causes unrelated to the Accident. (Doc. No. 1 ¶ 7; Doc. No. 17 at 3.)

On March 11, 2010, Defendant filed suit in San Diego Superior Court against Robert's estate, seeking monetary relief for personal injuries and property damages sustained as a result of the Accident (the "State Court Action"). (Doc. No. 1 ¶ 8.) According to the terms of the Automobile Policy, Plaintiff agreed to defend and indemnify Robert's estate in the State Court Action up to the $100,000.00 policy limit.[4] On or

---

[4] The Automobile Policy covered the Vehicle and afforded liability coverage with a limit of $100,000.00 per injured person. (Doc. No. 17 at 2; Doc. No. 1 ¶ 5.) Since Robert was a permissive user of the Vehicle, (Doc. No. 14, Vida Decl., Ex. A, Gordon Depo. at 47-48), he qualified as an "insured person" under the Automobile Policy, (Doc. No. 14, Rivera Decl. ¶ 8; Doc. No. 1 ¶¶ 9, 10).

about September 15, 2011, Defendant obtained judgment in the State Court Action against Robert's estate in the amount of $204,123.75. (*Id*. at ¶ 11.) Of this amount, Plaintiff agreed to pay $85,000.00, as $15,000.00 had already been paid to settle Defendant's claims against Gordon. (*Id*. at ¶ 12.) This left $119,123.75 remaining, which Defendant sought to recover from Plaintiff under Gordon's PUP. (*Id*. at ¶ 13.) Plaintiff refused to pay this amount, arguing Robert is not covered under the PUP because he is not a resident of Gordon's household.

### III. Terms of the Policy

Under the terms of the PUP, Plaintiff is obligated to "pay damages which an insured person becomes legally obligated to pay because of bodily injury, personal injury or property damage," arising out of a covered occurrence. (Doc. No. 14, Rivera Decl., Ex. 3, PUP at 5.) The PUP defines "insured person" as:

> a) You, and any other person who is named on the Policy Declarations;
> b) any person related to you by blood, marriage or adoption who is a resident of your household; or
> c) any dependent person in your care, if that person is a resident of your household.

(*Id*. at 2). The PUP further defines "you" and "your" as "the person named on the policy declarations as the insured and that person's resident spouse," and an "occurrence" as an "accident during the policy period . . . resulting in bodily injury, personal injury or property damage." (*Id*.) The PUP does not define "resident" or "household." (Doc. No. 14, Rivera Decl., Ex. 3, PUP.)

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure requires the court to grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the court of the basis for its motion, thereby identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions and affidavits on file, that demonstrate the absence of a genuine dispute as to any material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where parties file cross-motions for summary judgment, the court must consider each party's evidence, regardless of which motion the evidence is offered under. See *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. A moving party without the ultimate burden of persuasion at trial has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. See *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute as to any material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, the purpose of summary judgment is to pierce the pleadings and to assess the proof to see whether there is a genuine need for trial. *Id.* at 587 (quotations omitted). Therefore, in resolving a summary judgment motion, the evidence of the opposing party is to be believed, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citation omitted).

## DISCUSSION

Pursuant to Gordon's Automobile Policy, Plaintiff agreed to defend and indemnify Robert's estate up to the policy limit of $100,000.00. However, because this amount was insufficient to cover the full amount awarded Defendant in the State Court Action, which totaled $204,123.75, Defendant sought payment of the remaining balance, which totaled $119,123.75, under Gordon's PUP. In response, Plaintiff denied coverage under the PUP, arguing that Robert was not an "insured person" as defined under the policy. As the parties agree that Robert is not the "named insured" on the PUP or the resident spouse of the "named insured," the sole issue before the Court is whether Robert qualifies as an "insured person" under subsections (b) or (c) of Gordon's PUP. Accordingly, the Court

first addresses the interpretation of insurance policies under California law, and then analyzes whether Robert was a "resident" of Gordon's "household" as required under subsection (b), or a dependent person in Gordon's care who was also a "resident" of Gordon's "household," as required under subsection (c).

**I.      Interpretation of Insurance Policies Under California Law**

California law governs the interpretation of insurance policies. *See Allstate Ins. Co. v. Smith*, 929 F.2d 447, 449 (9th Cir. 1991). Although insurance policies have special features, their interpretation is similar to any other contract and is primarily a judicial function. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 22, 44 Cal. Rptr. 2d 370, 900 P.2d 619 (Cal. Ct. App. 1995); *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 776 (9th Cir. 2009). The primary goal of contract interpretation, and therefore policy interpretation, is "to give effect to the mutual intention of the parties." Cal. Civ. Code § 1636. To the extent possible, the intent of the parties is to be inferred solely from the written provisions of the policy, and where the language of the policy is clear and unambiguous, it governs. *See La Jolla Beach & Tennis Club, Inc. v. Indus. Indem. Co.*, 9 Cal. 4th 27, 37, 36 Cal. Rptr. 2d 100, 884 P.2d 1048 (Cal. 1994).

A contractual policy provision will be found ambiguous only where it is susceptible to two or more reasonable interpretations. *See Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal. 4th 854, 867, 855 P.2d 1263 (Cal. 1993) ("The absence from the policy of a definition of [a] term . . . does not itself render the term ambiguous."). The Court construes the language of the policy in the context of the instrument as a whole and under the circumstances of the case. *See Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1265, 10 Cal. Rptr. 2d 538, 833 P.2d 545 (Cal. 1992). The language may not be found ambiguous in the abstract. *Id.* Nor will the Court find ambiguous or uncertain a policy term that has already been judicially interpreted. *See Bartlome v. State Farm*, 208 Cal. App. 3d 1235, 1239, 256 Cal. Rptr. 719 (Cal. Ct. App. 1989). Thus, if the court concludes a contractual term is ambiguous or uncertain, and such term has not been otherwise judicially interpreted, the court will interpret the contract language based

on "the objectively reasonable expectations of the insured." *Id*. at 1265, 256 Cal. Rptr. 719. Finally, in the event the court is unable to determine whether coverage is consistent with the insured's objectively reasonable expectations, the court will resolve the ambiguity against the insurer. *Id*.

## II. Analysis of "Insured Person" Under Gordon's Personal Umbrella Policy

Gordon's PUP clearly defines "insured person" to include: (b) a person related to the insured by "blood" who is also a "resident" of the insured's "household;" or (c) a "dependent" in the insured's care who is also a "resident" of the insured's "household." (Doc. No. 14, Rivera Decl., Ex. 3 at 2.) Although the PUP does not define the terms "resident" and "household," California courts have interpreted the provision "resident of the [named insured's] household" to impose two requirements: (1) the person for whom coverage is sought must belong to the same household as the named insured; and (2) the person for whom coverage is sought must permanently reside with the named insured. *See Jacobs v. Fire Ins. Exch.*, 227 Cal. App. 3d 584, 590, 278 Cal. Rptr. 52 (Cal. Ct. App. 1991). Accordingly, because both terms have been judicially interpreted, the Court finds neither term ambiguous. The Court first addresses whether Robert was a "resident" under the PUP and then addresses whether Robert and Gordon were members of the same "household."

### A. Permanent Resident

"Every person has, in law, a residence." Cal. Gov. Code § 243. The term "residence connotes any factual place of abode of some permanence, more than a temporary sojourn." *Utley v. Allstate Ins. Co.*, 19 Cal. App. 4th 815, 820, 24 Cal. Rptr. 2d 1 (Cal. Ct. App. 1993) (internal quotations omitted); *see also Hardware Mut. Cas. Co. v. Home Indem. Co.*, 241 Cal. App. 2d 303, 311 (Cal. Ct. App. 1966) (citing Webster's Third New International Dictionary and ultimately defining "residence" to be "one, other than a temporary or transient visitor, who lives together with others in the same house for a period of some duration, although he may not intend to remain there permanently"). Thus, a relative may be a "resident" of an insured's household even though he or she

does not live in the household on a daily basis. *Reserve Ins. Co. v. Apps*, 85 Cal. App. 3d 228, 231-32, 149 Cal. Rptr. 223 (Cal. Ct. App. 1978).

On the issue of "residence," the Court finds the court's analysis in *Utley v. Allstate Insurance Company* especially instructive. 19 Cal. App. 4th 815, 820, 24 Cal. Rptr. 2d 1 (Cal. Ct. App. 1993). In *Utley*, an adult son was living at his parents' home for approximately seven or eight months—between the time of his discharge from the military and his planned marriage—after which time he planned to move to a condominium with his new wife. *Utley*, 19 Cal. App. 4th at 821-22. Analyzing a "resident relative" exclusion, the *Utley* court found that the "dual residence" principle applied because "[a]ssuming for the moment that [the son]'s primary 'residence' was San Diego [where he had been stationed in the military], the record show[ed] that he used his parent's house as a second residence" rather than his primary residence. *Id*. at 822. Thus, even though the son did not change the address on his driver's license to reflect his parent's address, the court found this fact unpersuasive, and instead focused on the fact that the son "moved into his parents' house and used it as a place of residence." *Id.* at 820. As a result, the *Utley* court ultimately held that the son had two domiciles, one of which was his parents' residence. *Id.* at 823.

Here, the undisputed facts clearly demonstrate that the travel trailer was considered Robert's "settled or usual abode," and that Robert never had a secondary or any other domicile while living on Gordon's property. *See Cal. Cas. Indem. Exch. v. Frerichs*, 74 Cal. App. 4th 1446, 1453, 88 Cal. Rptr. 2d 858, 862 (Cal. Ct. App. 1999); *see also State Farm Mut. Auto. Ins. Co. v. Elkins* 52 Cal. App. 3d 534, 537–541, 125 Cal. Rptr. 139 (1975) (19-year-old daughter deemed a resident of father's household even though living in an separate apartment). Thus, even though Robert's stay in the travel trailer was broken into two separate occurrences, the first of which lasted less than two years and the second of which lasted over a year and half, Robert never had another residence while residing in the travel trailer. Therefore, the Court finds it immaterial that Robert's stay in the travel trailer was only intended to be temporary, especially in light of the fact that

Plaintiff has presented no evidence that Robert had any other residence during either time he lived on Gordon's property. *Cf. Ca. Cas. Indem. Exch. v. Frerichs*, 74 Cal. App. 4th 1446, 1453, 88 Cal. Rptr. 2d 858 (Cal. Ct. App. 1999) ("Given this meaning Hudson stopped residing with his parents in November 1995 and his housesitting for two weeks was not a taking up of residence."). Accordingly, because Gordon's subjective intent regarding the length of Robert's stay is irrelevant to the determination of whether Robert was a "resident" under the terms of the PUP, the Court finds Plaintiff's arguments unpersuasive. As a result, the Court finds Robert meets the definition of "resident" under Gordon's PUP.

### B. Same Household

Having found Robert to be a "resident" for purposes of coverage under Gordon's PUP, the Court next considers whether Robert was a member of Gordon's "household." California courts have held, as a matter of law, that "household" is not ambiguous, and that the term has a specific definition that is not dependent on the context of the policy. *Jacobs*, 227 Cal. App. 3d at 590 (disregarding prior cases that found the term "household" lacked an "absolute meaning" and holding that "the apparent conflict in cases interpreting 'household' is not due to any inherent ambiguity in the term itself, but instead arises from the difficulty of applying varying sets of facts to a fixed definition"); *Utley*, 19 Cal. App. 4th at 822 ("[T]he common thread that runs through [cases interpreting 'household'] is not whether the term[] . . . 'member of household' [is itself] inherently ambiguous, but whether, under the particular facts of each of those cases, insurance coverage was extended or excluded under the terms of the policy in question.") (quoting *Safeco Ins. Co. v. Gibson*, 211 Cal. App. 3d 176, 181 (Cal. Ct. App. 1989)).

Accordingly, when interpreting an insurance policy, California courts have judicially defined "household" as:

> a collection of persons, related or not, living together as a group or unit of permanent or domestic character, with one head, under one roof or within a common curtilage, who direct their attention toward a common goal consisting of their mutual interests.

*Jacobs*, 227 Cal. App. 3d at 594 (adopting holding of *Island v. Fireman's Fund Indem. Co.*, 30 Cal. 2d 541, 547-48, 184 P.2d 153 (Cal. 1947)).  Thus, in determining whether Robert was a member of Gordon's "household," the Court considers: (1) whether Robert and Gordon were a collection of persons living together as a group or unit of permanent or domestic character; (2) whether Gordon was the "head" of Robert's household; (3) whether Robert and Gordon resided under one roof or within a common curtilage; and (4) whether Robert and Gordon had one goal consisting of mutual interests.  *Jacobs*, 227 Cal. App. 3d at 594.

### 1. Collection of Persons Living Together as a Group of Permanent or Domestic Character

As explained by the court in *Jacobs v. Fire Insurance Exchange*, whether a collection of persons are considered a group of permanent and domestic character does not depend on whether the individuals "technically" live under one roof, but instead, depends on whether the insured considers the tortfeasor to be a member of his/her household, and more importantly, whether the tortfeasor is a member of another, more permanent household.  227 Cal. App. 3d at 594 n.4, 596.[5]  In *Jacobs*, the issue before the court was whether the tortfeasor grandson was a member of the grandmother's household for purposes of coverage under the grandmother's insurance policy.  *Id.* at 587.  In denying coverage under the policy, the *Jacobs* court reasoned that even though the grandson and grandmother technically lived under one roof—within a divided townhouse—the two residences were separated by a solid wall, had their own entrances, backyards, mailboxes, kitchens, and bathrooms, and the grandson never slept at, or stored his possessions in the grandmother's residence.  *Id.* at 588-89.  Thus, even though the grandmother was dependent on her daughter and the grandson for her daily medications,

---

[5] Following this reasoning, California courts have held that minor children in the military are members of their parents' "households" even though living outside the home. *See Northwestern Nat. Cas. Co. v. Davis*, 90 Cal. App. 3d 782, 153 Cal. Rptr. 556 (Cal. Ct. App. 1979); *Allstate Ins. Co. v. Smith*, 9 Cal. App. 3d 898, 88 Cal. Rptr. 593 (Cal. Ct. App. 1970).

medical appointments, and other daily tasks, the daughter and her family, which included the tortfeaser grandson, was completely self-sufficient, and did not likewise rely on the grandmother for their daily necessities. *Id.* Accordingly, because the daughter and her family paid the same rental amount as previous tenants, and ate their meals separate and apart from the grandmother, the *Jacobs* court held that the grandson was not a resident of the grandmother's household for purposes of coverage under the insurance policy. *Id.* at 596.

Although not controlling, decisions from other jurisdictions provide additional guidance on the interpretation and corresponding application of the phrase: "collection of persons, whether related or not, who live together as a group or unit of permanent or domestic character." *Id.* at 594. For example, in *Hernandez v. Comco Insurance Company*, 357 So.2d 1368, 1371 (La. Ct. App. 1978), the court held that a daughter and her husband, who lived in a separate smaller structure that was adjacent to the parent's (the insureds) main residence, yet still effectively on the parents' property, were not residents of the parents' household because the two families were effectively living as separate, independent units. *Id.* at 1371. Crucial to this determination, the *Hernandez* court noted that the daughter and her husbands' residence had its own kitchen, living room, bathroom, and bedrooms, and that the daughter and her husband paid all their own utilities, purchased their own groceries, cooked their own meals, and did their own laundry. *Id*. at 1369-70. Thus, although the daughter and her husband resided on the parents' property, in a structure built by the parents, the daughter and her husband were sufficiently independent to preclude a finding of a "common household." *Id*. at 1371.[6]

Moreover, and perhaps even more in line with the facts of the instant case, the Court finds *Mazzilli v. Accident & Casualty Insurance Company of Winterthur, Switzer-*

---

[6] The *Hernandez* court utilized the following definition of "household," which is strikingly similar to the definition employed by California courts following *Jacobs*: "a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a 'collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness. *Hernandez*, 357 So.2d at 1370-71.

*land*, 35 N.J. 1, 170 A.2d 800 (N.J. 1961), especially instructive. In *Mazzilli*, a wife was held to be a resident of her ex-husband's household, despite living with her son in a separate four-room bungalow on the same property, because it was not unreasonable to conclude that the two dwellings, even though 150 feet apart, constituted one "household." *Id.* at 3, 15. Thus, in affirming coverage under the insurance policy, the *Mazzilli* court noted that the term "household or resident of household cannot be so limited and strait-jacketed as always to mean, regardless of facts and circumstances, a collective body of persons who live in *one* house." *Id.* at 14 (internal quotations omitted) (emphasis added). Accordingly, because the facts exhibited a "continuance of a substantially integrated family relationship," the *Mazzilli* court found that the wife was a member of the ex-husband's household. *Id.* at 19 ("[the insured] keeping [his wife] in the bungalow retained the intimate family contact to the extent that he desired, and undoubtedly explains why he considered the premises all one place where the entire family was living) (internal quotations omitted).

      Similarly, in this case, despite differences of opinion between Robert and Gordon, or Gordon's overall unhappiness with Robert's residence on his property, Gordon's relationship with his brother compelled him to honor his family obligations, thereby providing Robert with a place to live. The fact that Gordon's late-wife was not personally fond of Robert, or the fact that Gordon required Robert to not enter the main residence, or at one time even asked Robert to move off the Property, does not change the underlying nature of the living arrangements between Robert and Gordon. (Doc. No. 17, O'Nell Decl., Ex. C, Gordon Depo. at 89:25-90:16.) Thus, in stark contrast to *Jacobs* and *Hernandez*, where the tortfeasor was not dependent on the insured, here, Gordon provided Robert with the daily necessities of life, including a place to stay, and free water and electricity. (*Id.* at 70:21-71:18.) Therefore, even though the travel trailer had its own septic system, refrigerator, gas stove, microwave, and sink, (Doc. No. 14, Vida Decl. at pp.53-4, 79), and Robert paid for most of his own expenses, including food, gas, car

maintenance, and satellite television, (*Id*. at pp.78-9, 61-2, 68-9), Robert was nonetheless dependent on Gordon for shelter and basic utilities.[7]

Therefore, similar to *Mazzilli*, wherein the ex-husband looked past personal differences with his ex-wife when he allowed her and his son to continue to live on his property, here, Gordon looked beyond his own personal differences with Robert because he knew his brother was unable to otherwise provide for himself. *Mazzilli*, 35 N.J. at 16. Accordingly, unlike *Jacobs* and *Hernandez*, this is not the case where the tortfeasor is a member of an independently sufficient household, which is separate and distinct form the insured's household. *Jacobs*, 227 Cal. App. 3d at 596; *Hernandez*, 357 So.2d at 1371. As a result, the Court finds Robert and Gordon were a collection of persons living together as a group or unit of permanent or domestic character, and the first *Jacobs*' element is satisfied for purposes of coverage under Gordon's PUP.

### 2.     Under One Head of Household

Next, the Court considers whether Robert was under Gordon's authority as "head" of the household. *Jacobs*, 227 Cal. App. 3d at 591. As articulated by the court in *Jacobs*, "head" of the household should be broadly interpreted to mean "a common source of authority or leadership to which the other members of the household are subject." *Id*. at 594 n.5. Thus, the head of the household may be "a father, a mother, both parents acting together, or some other person whom the members of the household recognize as their head." *Id*. (internal quotations omitted). As a result, where the insured and the tortfeasor are members of two separate and independent households, courts have denied coverage under the insured's policy, finding the two households were not under the same "head." *See id.* at 588 (finding the head of the grandson's household was his own parents and not

---

[7] Moreover, although Gordon asked Robert to pay $100 a month to live in the travel trailer, there was never a written agreement between the brothers, and Gordon never received more than $20 a month from Robert. (Doc. No. 17, O'Nell Decl., Ex. C, Gordon Depo. at 65:18-66:14, 71:6-12.) Furthermore, Gordon purchased, registered, and insured a vehicle in his own name on behalf of Robert, who promised to pay him monthly in return. (*Id*. at 47:21-49:13.) However, Gordon never received any monetary payment from Robert, who decided instead to give Gordon his old vehicle, which was then donated, and claimed as a tax refund by Gordon. (*Id*.)

his grandmother); *Hernandez*, 357 So.2d at 1371 (finding that the insured-parents were not the head of the daughter and husbands' household, despite the fact that the daughter and husband lived in a house built by the parents); *Lumbermen's Mut. Cas. Co. v. Pulsifer*, 41 F. Supp. 249, 250 (D.C. Me. 1941) (finding the insured was not the head of the tortfeaser's household because the insured did not exercise any control over the tortfeaser and his wife").

Here, in contrast to *Jacobs*, *Hernandez*, and *Lumbermen's*, the Court finds Robert was at all times subject to Gordon's authority, such that he was not the head of his own independent household. For example, Gordon prohibited Robert from entering the main residence, (Doc. No. 17, O'Nell Decl., Ex. C, Gordon Depo. at 42:6-42; Doc. No. 14, Vida Decl., Ex. A, Gordon Depo. at 42), Gordon required Robert to erect a separate fence around the travel trailer to restrict his dogs, (Doc. No. 17, O'Nell Decl., Ex. C, Gordon Depo at 84:6-24; Doc. No. 14, Vida Decl., Ex. A, Gordon Depo. at 84), and Gordon prohibited Robert from socializing with Gordon's daughters, (Doc. No. 17, O'Nell Decl., Ex. C, Gordon Depo. at 79:3-7). Thus, much like a child is subjected to his parents' authority while residing in their residence, Robert was subjected to Gordon's authority while residing in Gordon's travel trailer. *See In re Scott K.*, 24 Cal. 3d 395, 408, 595 P.2d 105, 112 (Cal. 1979). Accordingly, the Court finds Gordon is the "head" of the household to which Robert submitted to. As a result, the second *Jacobs'* element is satisfied for purposes of extending coverage under Gordon's PUP.

### 3. Under One Roof or Within a Common Curtilage

Third, because it is undisputed that Robert and Gordon did not live under "one roof," the Court considers whether they resided "within one common curtilage." *Jacobs*, 227 Cal. App. 3d at 594. Curtilage has been defined as " '[t]he inclosed space of ground and buildings immediately surrounding a dwellinghouse. [Citations.] [¶] . . . A small piece of land, not necessarily inclosed, around the dwelling house, and generally includes the buildings used for domestic purposes in the conduct of family affairs.' " *Id.* at 592 n.4, quoting Black's Law Dict. (5th ed. 1979) p. 346, cols. 1-2. It "is the area which

extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of home itself for Fourth Amendment purposes." *People v. Shaw*, 97 Cal. App. 4th 833, 835, n.3 (Cal. Ct. App. 2020) (internal quotations and citations omitted) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).  Whether an area around a residence constitutes "curtilage" is based on several factors, "including the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *People v. Zichwic*, 94 Cal. App. 4th 944, 953 (Cal. Ct. App. 2001) (internal quotations omitted) (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)).[8]

Although most of the cases analyzing curtilage do so within the context of the Fourth Amendment, the Court finds such cases instructive.  Therefore, because it is undisputed that Gordon's travel trailer was located within the perimeter fence that enclosed the main residence (second factor), the travel trailer was used by Robert for residential purposes (third factor), and the fence surrounding the entire property served to protect both residences from outside observation (fourth factor), the Court only considers the first factor—the distance between the primary residence and the travel trailer.

In *United States v. Dunn*, 480 U.S. 294, 301 (1987), the Supreme Court held that, standing in isolation, a barn located "60 yards [180 feet] from the house itself" may be outside the curtilage. *Dunn*, 480 U.S. at 302.  In doing so however, the Court also noted that "these [curtilage] factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's

---

[8] The Court in *Dunn* ultimately held that the barn was not within the curtilage of the home because: (1) the barn was a substantial distance away from the home; (2) there was a separate fence surrounding the home; (3) the barn was not primarily used for domestic affairs; and (4) the fence surrounding the barn was not the type used to prevent others from observing intimate details of the home. *Dunn*, 480 U.S. at 302-03.

'umbrella' of Fourth Amendment protection." *Id.* at 301. In a similar vein, Ninth Circuit cases have generally regarded the area around a structure that is more than 120 feet away from the residence to be outside the curtilage. *Compare United States v. Van Damme*, 48 F.3d 461, 464 (9th Cir. 1995) (finding 200 feet outside the curtilage); *United States v. Brady*, 993 F.2d 177, 178 (9th Cir. 1993) (finding 45 feet outside the curtilage); *United States v. Traynor*, 990 F.2d 1153, 1158 (9th Cir. 1993) (finding 70 to 75 feet outside the curtilage); *United States v. Calabrese*, 825 F.2d 1342, 1350 (9th Cir. 1987) (finding 50 feet outside the curtilage), *with United States v. Furrow*, 229 F.3d 805, 817 (9th Cir. 2000) (finding 100 feet inside the curtilage); *United States v. Depew*, 8 F.3d 1424, 1427 (9th Cir. 1993) (finding 60 feet inside the curtilage).

Moreover, and expanding beyond the simple calculation of distances, some circuit courts have noted the importance in considering whether the type of land at issue is rural, urban, or suburban. *See U.S. v. Reilly*, 76 F.3d 1271, 1277, *on reh'g*, 91 F.3d 331 (2d Cir.1996) (concerning a rural property); *U.S. v. Acosta*, 965 F.2d 1248, 1256 (3d Cir. 1992) (concerning an urban property); *see also U.S. v. Seidel*, 794 F. Supp. 1098, 1103 (S.D. Fl. 1992) (concerning a suburban property). Thus, where the residence at issue is in a rural setting, some courts have held that the curtilage may encompass more area than would normally be included within the curtilage if the residence was in an urban or suburban setting. *See, e.g., Reilly*, 76 F.3d at 1277 (finding that "on a large parcel of land, a pond 300 feet away from a dwelling may be as intimately connected to the residence as is the backyard grill of the bloke next door"); *U.S. v. Johnson*, 256 F.3d 895, 902 (9th Cir. 2001) (stating that the "realities of rural country life dictate that distances between outbuildings will be greater than on urban or suburban properties and yet still encompass activities intimately associated with the home; this is the nature of the farmstead.") (internal quotations omitted).

Here, Gordon's eleven-acre property was located in rural San Diego county, and included a main residence, a secondary residence, a travel trailer, and a covered carport used for storage. (Doc. No. 17, O'Nell Decl., Ex. C, Gordon Depo. at 30:11-21, 55:21-

56:14, 62:16-25; Doc. No. 14, Vida Decl., Ex. A, Gordon Depo at 30, 55-6, 62.) Thus, although the travel trailer at issue was located nearly 300 feet from the main residence, (Doc. No. 17, O'Nell Decl., Ex. C, Gordon Depo. at 62:11-14; Doc. No. 14, Vida Decl., Ex. A, Gordon Depo. at 62), which exceeds the distance found to be inside the curtilage in the Fourth Amendment cases noted above, the Court finds the rural nature of the property, coupled with the sheer acreage of Gordon's property, does not defeat a determination that the travel trailer was within the curtilage of the main residence. Therefore, in light of the case-by-case analysis established by the Supreme Court in *Dunn*, and the Ninth's Circuit recognition that different types of land require a different analysis, the Court finds the distance of the travel trailer from the main residence is not in and of itself dispositive.[9] Accordingly, on the specific facts in this case, the Court finds that the travel trailer is within the common curtilage of the main residence, and therefore, the third *Jacobs'* element is satisfied for purposes of extending coverage under Gordon's PUP.

### 4. One Goal Consisting of Mutual Interests

Finally, the Court considers the extent to which Robert and Gordon directed their attention towards "a common goal consisting of mutual interests." *Jacobs*, 227 Cal. App. 3d at 594. However, because Gordon does not contest that he and Robert had the same goal in mind—to allow Robert to live in the travel trailer until he got back on his feet—the Court finds this factor is easily established. (Doc. No. 17, O'Nell Decl., Ex. C, Gordon Depo. at 27:5-6, 89:25-90:16; Doc. No. 14, Vida Decl., Ex. A, Gordon Depo. at 27, 89-90.) Thus, it is immaterial that Robert and Gordon did not live under the same roof, or that Gordon was in Tecate, Mexico for a large segment of Robert's second stay in the travel trailer. All that matters is that both Robert and Gordon both had the same goal in mind—for Robert to "get on his feet" as soon as possible. (Doc. No. 17, O'Nell Decl., Ex. C., Gordon Depo. at 90:3-5; Doc. No. 14, Vida Decl., Ex. C, Gordon Depo. at 90.)

---

[9] Additionally, the Court finds it immaterial that Gordon required Robert to erect a separate fence around the travel trailer. This fence was meant to inhibit the movement of Robert's dogs, not to prevent observation into the travel trailer from outside observers.

Accordingly, the Court finds the fourth *Jacobs'* factor also weighs in favor of extending coverage under Gordon's PUP.

## CONCLUSION

For the reasons set forth above, the Court finds Robert is a "member" of Gordon's "household" for purposes of extending coverage under Gordon's PUP. Accordingly, Plaintiff's Motion for Summary Judgment is DENIED, (Doc. No. 14), and Defendant's cross-motion for summary judgment is GRANTED, (Doc. No. 17). The Clerk of Court is instructed to enter judgment and close the case.

IT IS SO ORDERED.

DATED: April 16, 2013

Hon. Anthony J. Battaglia
U.S. District Judge